v. U.S. Bank of Canada, Appellant, and Cross v. U.S. Bank of Canada, Appellant, and Cross v. U.S. Bank of Canada, Appellant, and Cross v. U.S. Bank of Canada, Appellant, and Cross v. U.S. Bank of Canada, Appellant, and Cross v. U.S. Bank of Canada, Appellant. In light of the Florida Supreme Court's Prucco decision, which issued on essentially identical facts while this case was pending. But I want to be sure we spend some time on why even if Delaware law applies, there was an insurable interest at inception. Why don't you start with why Florida law governs? I will, Your Honor. Lex Prucco Contractus. We know that for contracts in general in Florida, the choice of law rule for contract disputes, as opposed to tort or other disputes, is the place where the contract was made. We also know that for insurance contracts in particular, the place where the contract is made is, as this court correctly held in Martinez, applying other states' laws under Florida's choice of law rule. It's the place where the insured signs the application. It is not the last act test. Just to be clear, Your Honor, I know that there's some dispute over what Florida law is as interpreted by this circuit. You have the Fioretti decision, which does... Did you argue in your primary brief that the last act test is not the test? Yes, Your Honor. Where is that? Your Honor, we argued in the opening brief. Let me give you a couple of sites, Your Honor. We clearly preserved that argument below. You've got that in the summary judgment of the decision. Listen, my question is about the opening brief. Could you hold on for one second, Your Honor? Sure. Or maybe you can do it in the rebuttal. That'd be fine. Thank you, Your Honor. To be clear, we plainly argued in the blue brief that law of the place of contract formation was made. I think the dispute here is Sun Life is going to tell you that you need the last act to know where the contract was made. We are arguing that as this court held in Martinez, the proper interpretation of Florida law is where did the insured sign the application, which here is indisputably Fort Lauderdale, Florida. Sun Life no longer disputes that Mrs. Malkin signed the application with her broker in Florida. Now, Your Honor, why that makes sense for an insurance contract is let's think about insurance contracts. You want there to be certainty. We know that Florida choice of law wants certainty. We know that from the intervening Florida Supreme Court decision in Roach. Roach said the reason why we have Lex Loci contract us here in Florida, even though it's an inflexible rule, is we really need certainty in insurance contracts. And a last act rule in insurance contracts would create terrible uncertainty. You might, for example, if you look to the last act here, for example, where is the last act here? Sun Life wants to tell you it's when the secondary owner, Wilmington Trust, received the policy in Delaware. But actually, for the policy to be effective, the first premium has to be received. And that happened later in Massachusetts. Wasn't the critical form executed and signed in Wilmington? That's not correct, Your Honor. Tell me why not. The only critical form, Your Honor, is the application that's signed in Florida. And that's made clear under Florida law. If you look at Florida statute 627.4045, it holds that the insured is a necessary party to an insurance contract. A secondary owner is not a necessary party to an insurance contract. Your Honor, Wilmington Trust is an owner, but it's not the insured. And under Florida statute, the crucial place of execution of the contract is where did the insured sign? Help me understand this. The acknowledgment and delivery receipt form, where was that signed? The owner signs in Delaware, Your Honor. We're not disputing that. What I'm suggesting to you is that for contracts... And that's the acknowledgment and delivery receipt form. I believe so, Your Honor. Yes, that's correct. So, Your Honor, here's what I'm asking you to do. Don't look to the owner. Let's think about a person with many children, adult children scattered in many states. They might have five children, five trusts, five states. You might have five owners in different states. The owners might all have received a copy of their mother's insurance policy. You don't want Florida life insurance law to be destabilized by the uncertainty that would obtain if we had to figure out which of those five states controlled the policy. The better rule, the one that provides certainty, is just look to the place where the insured signed the contract. She is the necessary party. Her application becomes part of the contract. But it isn't a contract at the time she signs it, right? Correct, Your Honor, but it becomes part of the contract. When Sun Life... You could have five, in your example, you could have five people who had to sign it before it became valid. Only as to the third party interest, Your Honor. It's valid when Sun Life signs it as between the insurer and the insured at the time that the insurance company signs it, which is up in Massachusetts, and my friends aren't even arguing for Massachusetts. Your Honor, I think that if you have any doubt... I'm not sure why one is more definite than the other. You're saying one will easily lead to the answer and the other test won't easily lead to the answer. That's your argument? Your Honor, we think that you already correctly interpreted Florida law in Martinez. I understand. We think that if you have any doubt about... But you're saying it hasn't been the law for a long time, is what you're saying now. It's always been the law. Lex loci contractus has always... I'm talking about the last act. The last act died a long time ago, is your position. Not just that Martinez rejected it. That's not quite right, Your Honor. We concede that last act is a relevant part of the inquiry into contract formation, place of contract formation for other contracts. We are arguing that last act has never been the law for insurance contracts. I see. Last act has never been the law for insurance contracts. Of course, Martinez didn't set forth an absolute rule, did it? Correct, Your Honor, but it applies... Martinez says the locus contractus is generally the state where the insured executed the insurance application. Correct, Your Honor. Rather than that it always governs. Correct, Your Honor. So if you look at what Martinez did, though, in the holdings, though, Martinez applied that in the holdings by finding that the insurance contracts at issue in that case were formed in the place where the insured signed the application. It held that as to all of the insureds in that case. Your Honor, if you have any doubt about last act versus place of where the insured signed the application, the proper course would be to certify to the Florida Supreme Court. But we do have an easier way for you to resolve the case. We think that the simpler, the more... Let me ask you this question about Martinez, just drilling down into it a little bit more. Yes, Your Honor. It cites favorably to Fioretti, doesn't it? Why do you suppose it does that? It cites Fioretti in passing, Your Honor. And it doesn't in any way engage with the choice of law analysis. Look, Fioretti, we think, just gets Florida law wrong. But you're not bound by the first in time rule by... No, I understand that. Because of Roach. Roach comes in between you. Okay. But Your Honor, I don't think Martinez can possibly be said to be incorporating Fioretti's rule because it states the opposite. Why? That's why I'm asking the question. Why do you suppose they cited Fioretti? For what point? For what purpose were they citing Fioretti? Just lex loci, contractus, just place of contract formation. Just more generally rather than for this specific issue. I think that's right, Your Honor. Just general boilerplate and background. But Your Honor, I see I'm going to run out of time before we get to Delaware. And if I could turn to Delaware, I want to get to what is perhaps the simpler way to resolve this without having to pronounce on Florida law of life insurance contract formation. And that is to find that U.S. Bank prevails clearly under Delaware law, even if Delaware law were the governing law here. And the reason for that is that Delaware law, exactly like Florida law as interpreted in Pruko, right? Delaware has the exact same insurable interest statute as Florida except for one sentence on which the states are actually in agreement. And Your Honor, I think the most important point about Delaware law really requires us just to look at the plain language of the Delaware insurable interest statute. And that is under Delaware law, it's 18 Delaware chapter 2704A, it's identical to Florida's insurable interest statute which appears at Florida statutes 627.4041. And the key here, the most important point I have to make to you about both Delaware and Florida law is each of them provide two different ways to prove that an insurance contract is not an impermissible wager on the life of the insured. And if we look at the statute, we can start with the Delaware one, although the language is identical in both. One way is to prove that the individual who insured her own life was the one who procured the policy. An individual may procure an insurance contract upon his or her own life for the benefit of any person. Now, we know from the history of concern about insurance wagering going back to medieval dead pools and the Assurance Act of England in 1774, we know that we allow the insurer to procure a policy on her own life even if she's going to sell it to someone else because we think she'll be interested in her life lasting. But there's a second route. And before I sit down and try to preserve some time for rebuttal, I want to highlight the last clause of the sentence, which we focus on in the yellow brief at page 20 and the pages following it. And that says, no person shall procure an insurance contract upon the life or body of another individual. No third party may buy a policy on my life unless the benefits payable under such contract are payable to a person having at the time when such contract was made an insurable interest in the individual insured. Now, that takes us to Mr. Malkin. And the key to the case and the key to why there's no conflict between Delaware and Florida law here is that it is indisputable that Mr. Malkin was a person with an insurable interest in Mrs. Malkin's life at the time the contract was made. Mr. Malkin, so there's route two to negating the wager. Route one is prove that the insured actually procured her own life insurance policy. But route two, which was the decisive route in Pruko, is prove that there's a person who gets the, who's the beneficiary of the policy, who's going to receive the proceeds of the policy, and that that person has an insurable interest in the life of the insured. When you come back on rebuttal with the citations, could you also show where that argument is raised in the blue brief? Yes, your honor. I'd be happy to. Thank you. I'd like to reserve the rest of my time for rebuttal. You can. Thank you. I'd like to begin, if I could, counsel, by asking you a question where Miss Sullivan left off. Did Malkin have an insurable interest in the life of the insured? No. Under Delaware law, she- Tell me why not. When you say Malkin, do you mean the husband? Yeah. Right. Very clearly, under Delaware law, price stall controls and technical compliance with the was just explaining, right, does not validate a life insurance policy or create an insurable interest. Delaware has a constitutional prohibition on wagering on human life, and it's a backstop. Actually, if you look at price stall, okay, it addresses specifically the argument that counsel's raising, which is that the husband had an insurable interest. Their point fundamentally, we call it the ultimate beneficiary argument. Their point fundamentally is, oh, the husband's the ultimate beneficiary because he's the beneficiary of the trust, and the trust is the beneficiary of the policy. When you look at the Delaware insurable interest statute, and you get the 2704A, and you get to that last clause, oh, gee whiz, it says that that's valid, and now there's an insurable interest. That's the whole point of price stall. You can't do an end run around the constitutional prohibition on human life wagering, and they even say it in the opinion. There's a quote from the Floyd case. Now, Floyd was an older Delaware Superior Court case. It was affirmed by the Supreme Court, though, and it was cited by price stall, and here's what they say, Your Honor. This is page 1072 of price stall. If the beneficiary has an insurable interest, and the transaction is otherwise legal, then the policy is then valid. That first clause, if the beneficiary has an insurable interest, that's counsel's argument. That's what she just explained was their most important point, that they have a lockdown victory here. Forget the record. Forget all of this shenanigans because the husband was penciled in there. They win, but the price stall court says no. And if that, and the transaction is otherwise legal, and it's in italics in the opinion, so the price stall court added that emphasis to the Floyd language, basically saying, no, wait a second. It can't be that it was procured by a third party, and it can't be that it was a wager. Counsel, much of the yellow brief focuses on what would happen if there had been a death during the initial two years. Is that correct? I lost you there. No, it's just my glasses. Okay. I could only see you with my glasses on, and I can only see the papers without them. Okay. All right. Are you with me? Yes, I am. And you claim in your final brief that that was not argued in the earlier brief, and we can evaluate that, I suppose. But I'm wondering what exactly would have happened if there had been, if the insured had died during the two years? Well, I guess— Would the husband have ultimately gotten the money? We don't know that for certain, Your Honor. What's most likely under the contractual provisions? I mean, you can look, you're a lawyer. It's entirely unclear. You can look at the contractual provisions. Why is it unclear? There's a power of attorney that was executed prior to this application even being submitted. The power of attorney was March 2nd, 2006. And in it, the wife, Phyllis, the insured, and then there's a related document where the husband gave all powers connected with this policy, all powers whatsoever, directly to Coventry, including the power to liquidate the policy. What if we read these documents as providing that at least during those two years, he would have got the money? Well, first, he would have saved the money. And do you lose? No, absolutely not. Why not? That's my question. These points, okay, are very related. Like, I've addressed the ultimate beneficiary argument. Right, right. This idea that, oh, there's a two-year loan, and maybe if the husband died in the meantime, there'd be some sort of payout to him is likewise the types of, I mean, Price et al.'s most important point is that the courts must scrutinize the circumstances. They must look behind. Just the argument that this sort of windfall that he would get is in the nature of a term life insurance policy that has a certain amount of value, and that that's just what was paid to him to allow his name to be used as a basis for gambling. Yes, Your Honor. I mean, if you think about it, Stoley Promoters for years were designing their transactions with the idea that later . . . So I guess your argument, if I'm understanding correctly, but I want to make sure I'm understanding it, or at least your argument is a version of the idea that if we were to to be used consistently to evade the Delaware statute because all they would have to do is grant some term life insurance as part of the payoff. That's 100 percent correct, Your Honor, and that's what makes Price et al. so different from the Pruko decision. And let me ask you a more technical, prosaic question. You say in your last brief that the third brief raised issues that were not raised in the first brief. Is that correct? There were issues raised, correct, and arguments. But I'm wondering whether you're allowed to say anything about issues raised in the first brief in a fourth brief under the federal rules. Shouldn't you have asked to strike the brief or asked for permission to respond to it rather than responding to it in a brief that arguably doesn't deal with those issues? Are you with me? Yes, I am, Your Honor, and fundamentally the answer is no, not in this particular circumstance because first, well, fundamentally our argument for premium retention turns on three things. Delaware law applies. Yeah, I understand you're saying something new was raised in the reply brief, but when that happens in a non-cross appeal, you don't get to just file another brief. You have to ask permission to file another brief. Are you with me, do you see? But instead, you used a reply brief on a different issue to argue that— I understand, Your Honor, and my point only was that we're permitted to make whatever arguments we'd like in connection with the choice of law, in connection with the stolen nature of the transaction, and premium retention in our final brief because our premium retention argument is based on the idea that Delaware law applies and this is a stolen transaction. It was sufficiently related to the cross appeal, is that it? Absolutely, in our statement— I'm questioning that a little bit, but I'm not sure it makes any difference here. Well, Your Honor, just to answer the rest of the question, going back to what the payments made after the person dies during the two years, the record in this case is massive. We brought it in a box, we're obviously not going to need it, but the record in this case is large, it's uncontradicted, and it all points one way. All of these transactions were controlled completely by Coventry from the very beginning, right up through the end, and there's no dispute about that whatsoever. That includes things like the loan transaction. These individual insurers were confronted by Coventry with a series of pre-drafted boilerplate documents that were non-negotiable and were in blank. With the exception of the names of the insurers, they were all the same, and the decisions about which insurance company are we going to apply to, how big is the policy going to be, how much are we going to fund it with, oh, how big is the loan going to be, because that ties directly to how much it's going to be funded. All of those decisions were made by one entity, Coventry. The insurers had no say in this matter whatsoever. It was a take it or leave it, and they all took it, and what we also know is that the Malkin transaction was exactly the same as all of the other life insurance capacity transactions. That's clear in the record, and there were 300 to 400 ultimately SIMBA deals. Every single one of them ended up in the hands of Coventry. The idea that, oh, because possibly this person could have died during the first two years and the husband might have collected doesn't cure this under priced off. First off, none of the 300 to 400 SIMBA insurers died during the two years, and part of the reason is Coventry gets a life expectancy report done in advance on these insurers before they even apply for the policies. Coventry's trying to hit the mark. They want them to last at least 26 months, and then once they've hit the 26-month mark, they want them to die as soon as possible thereafter. In connection with the 300 to 400 SIMBA insurers, exactly zero of them died during that two-year window, and it's for a reason. This is all by design. None of these people wanted or needed insurance, and this policy ended up exactly as planned in hands of Coventry, and all 300 to 400 of these transactions ended up on the secondary market. So forgive me. You'll permit me. I'm going to move on to premium retention. Human life wagers, and this does relate to the second issue, very clearly under priced off. They're unconstitutional. Are they criminal? If you enter into a void contract, that's not criminal, is it? I think it depends on the facts of the case. Well, yeah. Some void contracts might be criminal, like if you agree to kill someone, but categorically, they're not categorically criminal. I mean, you can enter into a void contract that's against public policy, and the recourse is that it's void. That's right. Same with an unconstitutional contract. I mean, this is unconstitutional. It's a fundamental violation of public policy under Delaware law. It was described by the priced off court as a fraud on the court. I mean, our view of it is that these are basically mortal sins, and they're all void ab initio under Delaware law, and how do we know that? That is, but are all void ab initio contracts subject to the rule that you can't sue to get your money back? Yes, Your Honor, and that's true from priced off. There's a quote in priced off where they say these contracts are never enforceable, regardless of the intentions of the parties. We also cite . . . Not enforceable is different from whether you can get your money back when you've paid on a void contract. No, I understand. The next case . . . You might enter into a void contract not knowing that it's void. You may not be a good lawyer or have a good lawyer. You enter into a void contract. I mean, I'm asking you. I'm not an expert on the contract law of void contracts, but it seems to me like you might be able to have a category of cases that are void against public policy for good reasons, and you enter into them without having talked to your lawyer. You might still get your money back. Delaware versus Diamond, Your Honor, was a void contract, and this is the Delaware Supreme Court. It's cited in our briefs, and under the law of Delaware, you leave the parties where you find them, and that is the general rule . . . For every void contract? For void ab initio contracts, you're supposed to leave . . . that's the general rule, and then there's an exception. So the general rule is basically Restatement Section 197. Yeah. The exception is 198. The argument that U.S. Bank makes is that, oh, they're a good faith purchaser, and under Section 198, they're excusably ignorant, or they're somehow not in pari delecto. That was not raised below, Your Honor. Good faith purchaser wasn't. Excusable ignorance wasn't, and nor was the argument that they're not in pari delecto, and when you look at the record here, even if you were to look at the record, since they didn't raise it below, I think they can't raise it now, but if you were going to look at the record, what is U.S. Bank trying to do? They're asking for a risk-free bet. That's what they're trying to do. They're basically . . . and look at the context, right, in the record that we're not . . . Look at what the insurance company's trying to do, saying, I don't have to pay on the policy, and by the way, you don't get your premiums back. It's kind of like the Hornbook law, that in the common law, when the insurance company says the contract's not void, I don't have to pay any life insurance. Sometimes they go into the district court, do a declaratory judgment. Here are the premiums. This is void. It was fraud. Most of the cases I've seen, they come in and say, you hid your medical condition. You didn't really tell us this. You've misrepresented everything in the application about your health. We would have never done this policy. It happens all the time. The insurance company can say it's void, but you've got to pay the premiums back. Well, two points, Your Honor. I mean, why shouldn't that clearly apply here? Two points, Your Honor, if you're . . . Plus interest. In fact, I'm just speaking for myself. There are . . . If we go that route. . . . careful distinctions are drawn in those cases, and PriceDoll discusses this. There's a difference between contracts that are voidable, and that can involve fraud, and contracts that are void ab initio. The PriceDoll court is clear when, under Delaware law, which applies here, if a contract is void ab initio, never enforced, and I understand your Honor's point, and your Honor's point, that that's not the same as returning premiums, but when you read the cases, and you read them properly, and you understand you're not talking about rescission, someone needs to prove excusable ignorance, or not in pari delacto, or some other argument to change it, and they haven't done that. Let me ask you the question this way. Wasn't the district court basically sitting in equity, and applying an equitable remedy in return, in returning the premiums? Isn't this an equitable determination? And if indeed it is, are we obliged to review it only for abuse of discretion? The district court dismissed all of their affirmative defenses on summary judgment, dismissed all of their counterclaims on summary judgment. I'm asking about the U.S. Bank getting its premiums back. Insofar as the district court rendered a judgment of that kind, was it not making an equitable determination? I think it was the beginning of one, your Honor. My point is that there's a record. Either it sounded in equity, or it did not. Well, to the extent. If the answer is that it did, why wouldn't we review what the district court did only for abuse of discretion? Thank you, your Honor. To the extent the district court focused on equitable remedies, the district court was focusing on its ruling against U.S. Bank, and it found that the Delaware public policy against gambling on human life, which is required by the Delaware Constitution, is paramount, and their affirmative defense is- Right. Indeed, all of the cases cited are basically- Right. She then- Let me finish. There are cases that were equitable in nature. Both parties essentially rely on doctrines of equity, not law on this issue. Isn't that right? At the end of the day, the premiums were- Rucker, Snyder, Burke, they all apply equitable doctrines of rescission. They were, and that's- This is cited by Sun Life. It looks to me like this court is sitting in equity in making this determination on the return of the premium. I'm asking two questions. They're real simple. One, did the district court make an equitable determination in ordering the return of the premiums? And if indeed the answer is yes,  Thank you, your Honor. The short answer is she may have been making an equitable determination, but it was in the context of rescission analysis, so it's not reviewed for abuse of discretion. Her analysis was incorrect. When you look at a void ab initio contract, you look at it differently, and the only defenses that can save U.S. Bank on premium retention are defenses that they didn't raise. Can I, in my closing- Well, is it undisputed that the bank did not have knowledge of Simba's actions? I mean, when he purchased the policy. Here's what we know about the bank. Now, it's just, is it undisputed? Is there any evidence they knew about it at the time that was put in the record in this case? I'd have to review carefully what they knew about this policy when it was put in place, but the origination agreement that they were a party to predates the policy by five years. They generated thousands of policies here. Their contracts with AIG and with Coventry provide provisions about what's going to happen if these things turn out to be invalid. Highly suspect commodities that they're trading in, and the record reflects exactly zero due diligence. You can look through these papers. They're a foot high. There's no due diligence, and we conducted this- You're just talking about one policy here, the Malkin policy. Thank you. You're talking about the time they bought this policy. I thought it was undisputed. They didn't have knowledge of the problems with the Malkin policy. They didn't even look at it, Your Honor. We conducted discovery with respect to what they did. They have a process where they just hit the rubber stamp, and they did that thousands of times. Can I just raise two points? Very briefly, counsel. Thank you. One is the facts of Price-Dahl are effectively the same as the facts of this case with respect to the ultimate beneficiary argument. In Price-Dahl, the policy was a trust-owned policy, and the family was the ultimate beneficiary. It was Dahl himself. So if Price-Dahl was going to permit a technical end run like what we're seeing here, Price-Dahl would have said what they had in that case was okay, the opinion would have been one page long. The only other point, Your Honor, that I'd like to make is on choice of law, there's actually a very, very simple answer to this that doesn't have... We went on Lex Loci contractus, but there's a very, very simple analysis that doesn't even require Lex Loci approach, and it's the statutes. Delaware's code and Florida's code expressly require the application of Delaware law to an insurable interest issue. The Delaware code is 2704E and G, and those sections are very clear. When a trust-owned policy, that's what we have here, is delivered in Delaware, Delaware law applies, and there's a corresponding Florida statute that actually disavows Florida's interest in insurable interest issues, and these are in our briefs at 627-4012, and this basically disavows any Florida-ish interest in life insurance policies that are not delivered or issued for delivery in Florida, and we don't have a dispute, Your Honor, about where our policy was delivered. It was delivered in Delaware. Your Honor's questions were on point with counsel, and that was confirmed in Delaware, and that is, by the way, where Sun Life's obligations became operative. I think you're going to have to bring your remarks to a conclusion. Thank you, Your Honor. Thank you. Thank you very much. Three very brief points, Your Honor. First, the facts of this case are entirely different from those in Price-Daw, and that's why there's no conflict. The facts of this case are exactly like Pruko. There's an insurable interest at inception in the beneficiary, husband's daughter's here husband. That means the policy had an insurable interest at inception under Delaware law just as plainly as under Florida law. What makes Price-Daw different is that the certified question before the Delaware court assumed that the ownership and beneficial interest in the policy was transferred immediately. Immediately. There was no two years of Mr. Malkin having the right. Does that mean, pardon me, I know you just have limited time. Does that mean that if we accept your argument that in Delaware, if they're following our holding, you can arrange one of these things to bet on the gamble on the life of somebody, and all you have to do is make sure that you present the people whose life you want to gamble on with a term life insurance policy for a limited period, which would have a small but defined value. It might be like the $20,000 that they supposedly gave them, right? Is that what that would enable? Your Honor, Delaware already has that law. That's the statute. The statute is- I'm just asking what the effects of our decision would be if we accepted your argument. It would be to lay out a route in which insurable interest could be obtained by granting a short term life insurance policy on somebody who's healthy. It doesn't cost you. It's a few thousand dollars and you get a one year term life insurance policy instead of giving them just cash and saying we'd like to gamble on your life, we give you a short term term life insurance policy. If we accept your argument, that would be okay under- and you're saying yes because that's what the statute says or you're saying no. I'm saying yes, that is okay. And Your Honor, to be clear, Mr. Malkin didn't just get a cash payout at the beginning. The key to our argument is Mr. Malkin would have gotten paid if Mrs. Malkin died within the first two years. But that's consistent with my hypothetical. A term life insurance pays, all right? You give somebody a term life insurance that's worth $10,000 and another $20,000 in cash. I thought that would- it seems like that ought to be just as contrary to Delaware policy as if you just gave them the $30,000 at the outset. But by giving them some money, if this is what the plaintiffs are describing, what the other side is describing, there is some money that goes to Malkin, right? The Malkins get some money out of the deal for the purpose of using their name. Your Honor, it's- Pruko has already blessed for Florida exactly what you just described. Yeah, I'm talking about Delaware. Delaware has the exact same law in Hike-Verba. Yeah, but they have language. They have this case which says you can't have these things. It doesn't say that at all, Your Honor. The most important thing about Price-Dawes, look at Certified Question 2. It's a certification. And Certified Question 2 assumes that all interest in the policy was immediately transferred. Right, and you're saying that language can be circumvented by anybody who wants to by handing over a term life insurance policy at the time that you enter into all the rest of these things that might be illegal without it. Your Honor, that's absolutely Florida law and it's absolutely Delaware law. Price-Dawes hasn't spoken to that. So the answer is just yes? Yes, Your Honor. The answer is yes. And there's nothing wrong with that. Price-Dawes says multiple times that it is not against Delaware law or policy to assign to a third party who lacks an insurable interest a contract that was valid at inception. The key to Delaware law- There's really no- For anyone with a good lawyer, there's no limit on what you can do. All you have to do is structure it as you want to gamble on this person's life. You pay him for the right to do it and you pay him in a certain structured way and it's okay. Your Honor- Is that right? I mean, if that's right, that's the argument. I understand the argument. If it's structured to create a real insurable interest in the beneficiary at inception- Which it would be if you gave them a short-term life insurance policy. Well, Your Honor, it has to- In here, it was two years, but there are- It couldn't be two days, I understand. But you give them a short-term insurance policy- Your Honor, I think it does matter because in Price-Daw, the assumption was it was immediate. It was simultaneous. The record below suggested it all happened within two months. Two years is not two months. But Your Honor, back to the point. It's not illegal. It's not illegal. It's not illegal. Delaware could change its law, but certainly the Price-Daw- They've left open a loophole, though. There's already a loophole in the law. All right. That's what I mean by left open. The statute controls, Your Honor, unless and until Delaware changes the statute. The statute's identical. We think Pruko is correctly decided under the exact same statutory language. The statutory language we're emphasizing- I want to stress this- is not the language that Price-Daw was considering. That mountain of evidence my friend on the other side referred to is all about, did Mrs. Malkin really procure the policy? That goes to Track 1. You negate the wager on Track 1 if somebody else besides Mrs. Malkin procured the policy. But we went on Track 2 as a matter of law under Delaware law because we had an insurable interest- the beneficiary had an insurable interest. Mr. Malkin had an insurable interest in Mrs. Malkin's life at Time 1. It really goes back to the way that the wagering law came about in the 18th century. You know, if you look at Price-Daw, it goes back to the history. It says, well, we assume that the insured has an interest in her own life continuing. We're also going to assume that her loved ones have an interest in her life continuing. So as long as at inception there is a real interest, insurable interest, in the person who loves the insured, we're done. That's a valid contract. The only reason the time interval comes up here is because we have to see whether the policy remained incontestable- became incontestable. And here it did because Mr. Malkin would have received the money up until past the incontestability point. I want to just speak to the point. I want to be absolutely clear, Your Honor. The contracts are clear. Mr. Malkin would have gotten the money had Mrs. Malkin died within two years. It's not contestable. Wilmington Trust was co-trustee with Mr. Malkin, but he was the beneficial owner. And, Your Honor, he was the beneficial owner. There's just no controversy over that. He- and look at the argument that my other- that the other side is making or that the district court would allow. Can it possibly be good for Florida insureds that if Mrs. Malkin had died within two years, we would say, oh no, void ab initio, you don't get your $5 million. That's the consequence of this argument. Or what if Mrs. Malkin had won the lottery and she wanted to- she changed her mind. She could have kept the policy. She didn't assign the policy. Power of attorney doesn't assign the policy. She could have said, I'm going to keep it because now I can pay the premiums, take them over myself. Their argument destroys the expectations of Florida insureds that if there is a real beneficiary with an insurable interest, a loved one in this case, in my life, I get to make a valid policy. That would have- that would wreak havoc on expectations of Florida insureds. It would also mean that if there wasn't a short-term policy, it was ab initio, but they paid them $20,000 for it, that they wouldn't be able to enforce the- they'd have to pay the $20,000 back, right? And that would be against the Florida interest, you would say. Your Honor, I don't want to get to premium return because we think you should reverse, but if you get to premium return, we respectfully agree with everything Judge Hull said about why the premium should go back. But that would be against the interest of the poor person who was about to get $20,000 for letting their name be used, they'd have to give the money back, right? Well, Your Honor, the- Your Honor, the- And that would be against the- but the court in Delaware doesn't care about that. They say, you don't get the $20,000. Your Honor, all the court in Delaware was discussing was a situation where we don't have Mr. Malkin. In a situation where there is no beneficiary with an insurable interest, then we ask about the mountain of paper in the boxes, who really procured it? Who really paid the premiums? That should never have been at issue in this case. And Your Honor, I'd just like to point out that we did preserve both arguments in the blue brief. I want to be responsive to your questions. We preserved the argument that last act does not apply in the blue brief at page 31, where we said the district court's deviation from Martinez's general rule and its application of the last act test was in error. And we preserved the argument that Mr. Malkin's insurable interest in Mrs. Malkin's life is sufficient to provide an insurable interest at inception as required under Delaware law, sufficient to negate the wager assumption. We preserved that in the blue brief at pages 39 to 40, where we pointed out the definition of Mr. Malkin. The definition of Delaware law makes Mr. Malkin as an individual related closely by blood or by law, a person with an insurable interest in Mrs. Malkin's life, citing to Delaware code 2704. Thank you. That's helpful. Thank you. And we made the argument as follows. Your Honor, the easiest way to resolve this is to say that the district court erred in misreading the Delaware decision in Price-Daw, which didn't speak to Arafax. Arafax are identical to Pruco and completely different from Price-Daw. In Price-Daw, there was an immediate transfer at inception. That's the assumption of the certified question. There was an immediate transfer at inception of ownership and beneficial interest to a third party without an insurable interest. Price-Daw suggests that if there's no beneficiary with an insurable interest, in other words, if there's no way to win on negating the wager on track two, the unless clause, then we look at the facts that go to track one, who really procured it. But Price-Daw did not speak to a situation whereas here, there is a beneficiary with a real insurable interest that's protected under statute at the time of inception. And Your Honor, if you think that this invites a loophole for lawyers, the answer is for Delaware to amend its statute. But the unless clause, plain as day, creates on the facts here, unlike the facts in Price-Daw where there was an immediate transfer, an insurable interest. Mr. Malkin really would have gotten the money for two years. And whether you like that or not, that's the law. And U.S. Bank has an incontestable right to the benefits from the policy. Thank you, counsel. Thank you both. Your Honor, may I correct the record on the Price-Daw case for one minute? No. This court is adjourned. Thank you.